**FILED**

MAR - 9 2007

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
BY _____ Deputy Clerk

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

U.S. BANKRUPTCY COURT
**ENTERED**
MAR 1 2 2007
Jon D. Ceretto, Clerk of Court
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ Deputy Clerk

In re:

CHARLES RUSSELL BUCKRIDGE,
JR.,

                    Debtor.

)
)
)
)
)
)
)
)
)
)

Case No. RS 04-17991 PC

Chapter 7

Date: February 5, 2007
Time: 9:30 a.m.
Place: United States Bankruptcy Court
          Courtroom # 303
          3420 Twelfth Street
          Riverside, CA 92501

## MEMORANDUM DECISION

Reid & Hellyer ("R&H"), general counsel for the chapter 7 trustee, Robert S. Whitmore ("Whitmore"), seeks allowance of a "fee enhancement" in the amount of $34,779.20, which constitutes the entire surplus of estate funds that would otherwise be returned to the Debtor, Charles Russell Buckridge, Jr. ("Buckridge") after the payment of allowed claims and administrative expenses in this case. Buckridge objects to the fee enhancement, claiming that R&H's request for a "bonus" is not supported by the evidence and should be denied. At the hearing, Whitmore appeared as chapter 7 trustee, Mark C. Schnitzer appeared on behalf Whitmore and R&H, and Gary Swanson appeared for Buckridge. The court, having considered R&H's final fee application and Buckridge's objection thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[1] pursuant to Fed. R. Civ. P. 52, as incorporated into Fed. R. Bankr. P. 7052 and made applicable to contested matters by Fed. R. Bankr. P. 9014(c).

ORIGINAL

---

[1] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.

1          I. STATEMENT OF FACTS

2          On July 6, 2004, Buckridge filed his voluntary petition under chapter 7 of the

3    Bankruptcy Code.[2]  Whitmore was appointed as trustee.  In his schedules, Buckridge

4    disclosed assets valued at $8,041 and liabilities in excess of $553,189.[3]  According to

5    Schedule A, Buckridge did not own an interest in any real property on the petition date.

6    The assets valued at $8,041 were disclosed in Schedule B as cash, checking accounts,

7    household furniture, audio, video and computer equipment, clothing, pictures, videos

8    and DVDs.  In response to Question # 19 of Schedule B, Buckridge declared under

9    penalty of perjury that he did not own an interest in the estate of a decedent or a trust at

10   the time of bankruptcy.

11         On August 10, 2004, Buckridge appeared and was examined by Whitmore under

12   oath at a meeting of creditors conducted pursuant to § 341(a).[4]  Based upon

13   Buckridge's schedules and sworn testimony, Whitmore concluded that there were no

14   non-exempt assets which could be liquidated for the payment of claims in the case.  On

15   August 12, 2004, Whitmore filed a Report of Trustee in Chapter 7 No Asset Case.

16   Buckridge was granted a discharge on October 19, 2004.  On November 3, 2004, an

17   order was entered discharging Whitmore as trustee and closing the case.

---

19   [2]  Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code,
20   11 U.S.C. §§ 101-1330 prior to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of
     2005, Pub. L. 109-8, 119 Stat. 23 (2005).  "Rule" references are to the Federal Rules of Bankruptcy
     Procedure ("Fed. R. Bankr. P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R.
21   Civ. P.").

22   [3]  Schedule E discloses a $110,113 unsecured priority claim held by the Internal Revenue Service ("IRS")
     for unpaid federal income taxes, and unsecured priority claims totaling $32,445 for unpaid income taxes
23   due the State of California and Employment Development Division ("EDD").  In Schedule F, Buckridge
     listed 25 creditors holding unsecured non-priority claims in excess of $341,188, primarily for credit card
24   debt and deficiency claims for repossessed boats, automobiles and a motor home.  Two additional
     unsecured non-priority claims totaling $69,443 appear to have been erroneously included in Schedule E.

25   [4]  The Code requires a debtor to appear and submit to examination under oath at a meeting of creditors.
     11 U.S.C. § 343; Fed. R. Bankr. P. 2003.  The examination focuses on the debtor's acts, conduct,
26   property, liabilities and financial condition, as well as any matter which might affect the administration of
     the bankruptcy estate and the debtor's right to a discharge.  Fed. R. Bankr. P. 2004(b).

27

1    On March 24, 2005, Whitmore received a tip from the IRS that Buckridge's father

2  had passed away on June 15, 2004, and that Buckridge had inherited approximately

3  $1,000,000 as the beneficiary of a trust which had not been disclosed in Schedule B.

4  Whitmore contacted the United States Trustee ("UST"), who immediately filed a motion

5  to reopen the case.  On March 30, 2005, an order was entered granting the UST's

6  motion, reopening the case, and ordering the appointment of a trustee.  On March 31,

7  2005, the UST reappointed Whitmore as chapter 7 trustee.  Whitmore then employed

8  R&H as general counsel to assist him in investigating and locating the undisclosed

9  asset.[5]

10    Shortly after its employment, R&H confirmed through an attorney in Florida

11  representing the probate estate of Buckridge's father that Buckridge had, in fact,

12  received a distribution from his father's estate in the sum of $1,000,000 shortly after

13  filing his bankruptcy petition.  R&H was provided with a copy of the $1,000,000 check

14  which reflected that it had been deposited by Buckridge in an account at Washington

15  Mutual Bank in Yucaipa, California.

16    On April 15, 2005, R&H filed a complaint on behalf of Whitmore in Adversary No.

17  05-01128, styled Robert S. Whitmore, Chapter 7 Trustee v. Charles Russell Buckridge,

18  Jr., seeking revocation of Buckridge's discharge for allegedly concealing receipt of a

19  $1,000,000 distribution on July 16, 2004, from Sharon L. Dalton, as Personal

20  Representative of the Estate of Charles R. Buckridge, Sr., and Trustee of the Charles R.

21  Buckridge Revocable Trust of 1993, dated May 7, 1993, as amended and restated on

22  June 8, 2004, and as further amended on June 10, 2004 ("the Inheritance").  Whitmore

23  also sought an order enjoining Buckridge from transferring, encumbering, concealing or

24  otherwise disposing of the Inheritance pending an adjudication of the estate's interest in

25  the Inheritance.  The court issued a temporary restraining order prohibiting Buckridge

26  _____

27  [5] 11 U.S.C. § 327(a); Fed. R. Bankr. P. 2014(a).

1  from transferring, concealing or disposing of the Inheritance, and ordering Buckridge to

2  appear on April 25, 2005, to show cause why a preliminary injunction should not be

3  granted pending a trial on the merits.

4       On April 25, 2005, the court issued a preliminary injunction enjoining Buckridge

5  from "selling, transferring, encumbering, concealing or otherwise disposing of" the

6  Inheritance and any real or personal property belonging to Buckridge traceable to the

7  Inheritance.[6]  While securing Buckridge's accounts at Washington Mutual, R&H learned

8  that Buckridge maintained several other accounts at Washington Mutual with his former

9  wife, Nancy K. Norris ("Norris").  R&H also discovered that Norris owned the real

10  property where Buckridge resided on the date of bankruptcy.

11  _____

12  [6] The Order Granting Preliminary Injunction entered on April 25, 2005 ("Buckridge Injunction") provided, in
pertinent part:

13       2.      That effective immediately, Defendant Charles Russell Buckridge, Jr. ("Defendant"), his

14              agents, servants, employees and attorneys and those persons in active concert or
               participation with him who receive actual notice of this order are restrained and enjoined

15              from using, selling, transferring, encumbering, concealing or otherwise disposing of any
               part of property received from Sharon Lynn Dalton, Trustee of The Charles R. Buckridge

16              Revocable Trust of 1993 dated May 7, 1993, as amended and restated on June 8, 2004,
               and as further amended on June 10, 2004, in the sum of $1.0 million ("Inheritance"),

17              including but not limited to cash; monies; rights; real or personal property; equity interests;
               or assets of any type owned by or belonging to the Defendant traceable to the

18              Inheritance, including but not limited to funds located in the Defendant's two bank
               accounts, Acct. Nos. ---------- and ----------, at Washington Mutual, Yucaipa. California

19              branch;

20       3.      That if any part of the $1.0 million Inheritance has been moved or deposited into other
               accounts, Defendant, his agents, servants, employees and attorneys, and those persons

21              in active concert or participation with him who receive actual notice of this Order are
               enjoined and restrained from using, transferring or otherwise dissipating any part of the

22              $1.0 million Inheritance from any other accounts to which the funds have been
               transferred;

23       4.      That until further Order of this Court, Washington Mutual Bank, 34318 Yucaipa Blvd.,

24              Yucaipa, California shall freeze the funds in Account Numbers ---------- and ----------, or
               any other accounts to which the subject funds have been transferred; . . .

25  Buckridge Injunction, p.1, l.28 to p.2, l.18 (account numbers omitted).

26

27

1    On April 29, 2005, Whitmore amended his complaint to restate his causes of

2  action against Buckridge and to name Norris as a defendant in the adversary

3  proceeding.  According to the amended complaint, Norris opened an account at

4  Washington Mutual Bank in her name only with an initial deposit of $950,000 on July 26,

5  2004.  Buckridge was listed as the beneficiary on the account.  The account was closed

6  on November 9, 2004.  To the extent that Buckridge transferred any portion of the

7  Inheritance to Norris, Whitmore sought a turnover of the funds under § 542(a) or,

8  alternatively, avoidance of the unauthorized post-petition transfer and recovery of the

9  funds pursuant to § 549 and § 550.

10    On April 29, 2005, the court issued a temporary restraining order prohibiting

11  Norris from transferring, concealing or disposing of any portion of the Inheritance in her

12  possession, custody or control, and ordering Norris to appear on May 9, 2005, to show

13  cause why a preliminary injunction should not be granted as to her pending a trial on the

14  merits.  Neither Buckridge or Norris responded to either Whitmore's amended complaint

15  or the court's orders to show cause.[7]  Instead, Buckridge requested conversion of his

16  chapter 7 case to a case under chapter 13 pursuant to § 706(a).[8]  Because the case

17

18    _____

[7] The temporary restraining order issued as to Norris on April 29, 2005, expired by operation of law on
19  May 9, 2005.  See Fed. R. Civ. P. 65(b), as incorporated into Fed. R. Bankr. P. 7065.

20  [8] Section 706(a) states that "[t]he debtor may convert a case under this chapter to a case under chapter
11, 12, or 13 of this title at any time, if the case has not been converted under section 1112, 1208, or 1307
21  of this title.  Any waiver of the right to convert a case under this subsection is unenforceable."  11 U.S.C. §
706(a).  At the time, the majority of courts supported the view that a bankruptcy court had no discretion to
22  deny a conversion if the case had not previously been converted and the debtor was eligible for the
chapter to which conversion was sought.  See e.g.,  Mason v. Young (In re Young), 237 F.3d 1168, 1173
23  (10th Cir. 2001); Finney v. Smith (In re Finney), 992 F.2d 43, 44-45 (4th Cir. 1993); Martin v. Martin (In re
Martin), 880 F.2d 857, 859 (5th Cir. 1989); Croston v. Davis (In re Croston), 313 B.R. 447, 451 (9th Cir.
24  BAP 2004).  Indeed, both the House and Senate reports to the Bankruptcy Reform Act of 1978 spoke of §
706(a) as giving the debtor an "absolute right" to convert.  See Street v. Lawson (In re Street), 55 B.R.
25  763, 765 (9th Cir. BAP 1985) (holding that a conversion from chapter 7 to chapter 13 following an adverse
decision on a nondischargeability action is not a subterfuge of the Code which would justify denial of
26  conversion).  However, the Supreme Court has since held that a debtor's motion to convert under § 706(a)
may be denied where court determines that the debtor has engaged in bad faith conduct.  Marrama v.
27  Citizens Bank of Mass., 549 U.S. ___, 127 S.Ct. 1105, 1111-12, ___ L.Ed.2d ___ (2007).

1  had not previously been converted, the court granted Buckridge's ex parte application

2  and converted the case to chapter 13 on May 4, 2005.[9]

3        On May 11, 2005, R&H filed a motion on behalf of Whitmore, as former chapter 7

4  trustee, seeking a reconversion of the case to chapter 7.  After a hearing held on

5  shortened notice, the court reconverted the case to chapter 7 for "cause" finding that

6  Buckridge was ineligible to be a debtor under chapter 13 on the date of filing and had

7  falsely represented in his conversion application that he was eligible to be a debtor in

8  chapter 13.[10]  The court further found that Buckridge's application was filed in bad faith

9  and primarily for the purpose of frustrating the chapter 7 trustee's efforts in the pending

10  adversary proceeding to revoke his discharge and recover the Inheritance alleged to be

11  an undisclosed asset of the chapter 7 estate.  An order reconverting the case to chapter

12  7 was entered on May 16, 2005, and Whitmore was again appointed as chapter 7

13  trustee.

14        On May 23, 2005, the court issued a preliminary injunction enjoining Norris from

15  "transferring, encumbering, concealing, or otherwise disposing of" any portion of the

16  Inheritance subject to her possession, custody or control.[11]  Buckridge and Norris were

17  _____

18  [9] While an absolute right to convert to chapter 13 may have been recognized prior to Marrama, the debtor had no absolute right to remain in chapter 13.  Croston, 313 B.R. at 452 (stating that a case that is

19  converted to chapter 11, 12, or 13 under § 706(a) is nonetheless vulnerable to conversion back to chapter 7 for "cause").

20  [10] Section 109(e) states: "Only an individual with regular income that owes, on the date of the filing of the

21  petition, noncontingent, liquidated, unsecured debts of less than $307,675 and noncontingent, liquidated, secured debts of less than $922,975 . . . may be a debtor under chapter 13 of this title."  11 U.S.C. §

22  109(e) (emphasis added).  Buckridge disclosed under penalty of perjury in Schedules E and F that he had unsecured debts in excess of $553,189 on the date of bankruptcy.  None of the debts were listed as

23  contingent, unliquidated, or disputed.

24  [11] The Order Granting Preliminary Injunction (Norris) dated May 23, 2005 ("Norris Injunction") provided, in pertinent part:

25      2.     That effective immediately, Defendant Nancy K. Norris ("Norris") is hereby restrained and

26            enjoined from selling, transferring, encumbering, concealing or otherwise disposing of any part of the funds received from Charles R. Buckridge, Jr. as part of an inheritance from

27            The Charles R. Buckridge Revocable Trust of 1993 dated May 7, 1993, as amended and

1  each properly served with a Summons and a copy of Whitmore's amended complaint,

2  but neither filed an answer or other responsive pleading by the deadline of June 17,

3  2005.  On June 21, 2005, R&H filed and served a request for entry of default.  On June

4  29, 2005, the defaults of Buckridge and Norris were entered by the clerk of the court.[12]

5        For the next four months, Whitmore and R&H continued doggedly to trace the

6  Inheritance and assets purchased with the Inheritance by Buckridge and Norris.

7  Ultimately, Whitmore and R&H were successful in freezing an annuity policy issued to

8  Norris by Jackson National Life Insurance Company and the assets of Buckridge and

9  Norris in five separate accounts at Washington Mutual Bank, including an account in

10  which Buckridge and Norris maintained a balance in excess of $300,000.  Buckridge did

11  not begin to cooperate with Whitmore nor disclose facts concerning the Inheritance until

12  after these assets were frozen and the depositions of Buckridge and Norris were

13  scheduled to be taken in the adversary proceeding.

14        On November 15, 2005, the court approved a Stipulation between Whitmore,

15  Buckridge and Norris under the terms of which Buckridge agreed to a revocation of his

16  discharge and payment of the sum of $300,000 to Whitmore, as chapter 7 trustee, for

17  _____

18      restated on June 8, 2004, and as further amended on June 10, 2004, in the sum of one

19  million dollars ($1,000,000) ("Inheritance"), or any other real or personal property traceable to the Inheritance or received from Charles R. Buckridge, Jr., including but not

20  limited to cash; monies; rights; real or personal property; equity interests; or assets of any type owned by or in the possession of Norris traceable to Charles R. Buckridge, Jr.,

21  including but not limited to (a) funds located in Bank Acct. No. ---------- in Norris' name, at Washington Mutual, Yucaipa, California branch; and (b) any other checking, savings,

22  investment, stock or mutual fund accounts, or the like, located at any financial institution including, but not limited to, banks, savings and loan, credit unions, stock brokers, mutual funds and the like.

23      3.    That until further Order of this Court, Washington Mutual Bank, 34318 Yucaipa Blvd.,

24  Yucaipa, California shall freeze the funds in Account No. ----------, or any other accounts maintained by Norris, or in which she has any interest, including but not limited to, co-

25  tenant, joint tenant, beneficiary, or the like. . . .

26  Norris Injunction, p.2, l.1-17 (account number omitted).

27  [12] See Fed. R. Civ. P. 55(a), as incorporated into Fed. R. Bankr. P. 7055.

1  the payment of all allowed claims and administrative expenses in the case.[13]  In

2  consideration therefor, Whitmore agreed to dissolve the Buckridge Injunction and Norris

3  Injunction and dismiss the adversary proceeding.  Buckridge's discharge was revoked

4  upon approval of the Stipulation.  Whitmore ultimately received the sum of $300,000

5  from Buckridge pursuant to the Stipulation, and the adversary proceeding was

6  dismissed on February 1, 2006.  Whitmore filed his final report as trustee on December

7  13, 2006.

8        On February 5, 2007, the court considered the final applications for

9  compensation filed by Whitmore and R&H.  Whitmore sought final allowance of

10  $18,391.44 in fees, plus expenses of $98.91, pursuant to § 326 and § 330 based upon

11  disbursements to parties in interest, excluding the debtor, of $302,828.81.[14]  Whitmore's

12  request for compensation was supported by contemporaneous time records

13  establishing the nature and extent of the services rendered on behalf of the estate.  See

14  In re Roderick Timber Co., 185 B.R. 601, 605-06 (9th Cir. BAP 1995).  At the hearing,

15  the court granted Whitmore's fee request, subject to any reduction necessitated by the

16  court's ruling on R&H's final application for compensation, finding that it met the

17  requirements of § 326(a) and § 330 and represented reasonable compensation for

18

19  [13] The deadline to file a proof of claim was September 12, 2005.  According to the claims register, the
20  following claims totaling $197,301.85 were filed in the case:

| | | | |
|---|---|---|---|
| 21 | 1. | IRS | $5,024.47 unsecured priority claim |
| | 2. | Franchise Tax Board | $1,724.03 unsecured priority claim |
| 22 | 3. | IRS | $187,195.14 unsecured non-priority claim |
| | 4. | NCS Corp. | $3,358.21 unsecured non-priority claim |

23  Whitmore's Final Report states that each claim will be paid in full, with interest, upon a final distribution in
the case.  According to the Stipulation, the Board of Equalization and EDD advised Whitmore that there
24  were no other state taxes owing by Buckridge, notwithstanding the fact that the State of California and
EDD were listed in Schedule E.
25

[14] Whitmore calculated his fee pursuant to § 326 based upon a disbursement of the $34,779.20 "fee
26  enhancement" sought by R&H.  Whitmore acknowledged that his fee under § 326 would be reduced to
$16,516.33 if the requested fee enhancement is denied and all surplus funds are returned to Buckridge.
27

1  actual, necessary services rendered to the estate.

2      In its second and final application, R&H seeks allowance of $36,904.50 in

3  attorneys fees, plus reimbursement of $3,421 in expenses, for legal services rendered

4  as Whitmore's general counsel in the case.[15]  R&H further seeks allowance of a "fee

5  enhancement" in the amount of $34,779.20, which constitutes the entire surplus of

6  estate funds that would otherwise be returned to Buckridge after the payment of allowed

7  claims and administrative expenses.[16]  Buckridge objects to the fee enhancement,

8  arguing that R&H "has not presented any evidence to warrant a bonus in this case, and

9  is not entitled to one."[17]

10                          II. DISCUSSION

11     This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§

12  157(b) and 1334(b).  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A),

13  (B) and (O).  Venue is appropriate in this court.  28 U.S.C. § 1409(a).

14  A.    R&H's Employment

15     Section 327(a) authorizes a trustee, with the court's approval, to employ an

16  attorney to assist him in carrying out his duties under the Code.  11 U.S.C. § 327(a).

17  The trustee may employ an attorney under § 327 "on any reasonable terms and

18

19  [15] On February 27, 2006, the court entered an order approving an interim allowance of $34,076 in fees,

20  plus reimbursement of $3,122.56 in costs, for legal services rendered by R&H from March 24, 2005
    through January 31, 2006.  R&H had sought an interim allowance of fees and expenses shortly after

21  Whitmore's receipt of the $300,000 payment from Buckridge and Norris.  In its second and final
    application, R&H seeks final allowance of such interim fees and expenses, together with final allowance of

22  $2,828.50 in fees, plus $298.44 in costs, for legal services rendered from February 1, 2006.

23  [16] In its interim fee application filed on February 3, 2006, R&H stated that "the Firm intends to request a
    bonus and will do so pursuant to a final application for fees to be filed when the Trustee is prepared to

24  close the case."  R&H's Application for Payment of Interim Fees and Expenses, p.6, l.22-23.

25  [17] Debtor's Opposition to Trustee's Final Report and Hearing on Applications for Approval of Professional
    Fees and Expenses, p.3, l.10-11.  Buckridge also objected to Whitmores' final report, demanding an
    explanation for what he perceived to be "the low amount of interest earned" on the estate funds.  Id. at p.2,

26  l.2-3.  At the hearing, however, Buckridge withdrew his objection to Whitmore's final report and request for
    compensation.

27

1  conditions of employment, including on a retainer, on an hourly basis, or on a contingent

2  fee basis." 11 U.S.C. § 328(a).

3      In this case, Whitmore elected to employ R&H on an hourly basis.  On April 27,

4  2005, Whitmore filed an application pursuant to § 327(a) seeking authorization to

5  employ R&H as general counsel, retroactive to March 24, 2005, to represent him in

6  connection with the administration of the estate and to compensate R&H for actual

7  necessary services rendered to the estate on an hourly basis according to the rates set

8  forth in a fee schedule attached as Exhibit 1 to the application.[18]  On May 18, 2005, the

9  court granted Whitmore's application and authorized Whitmore to employ R&H on the

10 terms set forth in the application "with their fee and expense reimbursement for services

11 rendered being subject to approval by the court retroactive to March 24, 2005, pursuant

12

13

_____

14 [19] Exhibit 1 attached to Whitmore's application states:

15                          **FEE SCHEDULE**

16                          Senior Attorneys:

| | |
|---|---|
| Norman L. Hanover | $450 |
| Mark C. Schnitzer | $360 |
| Martha A. Warriner | $325 |
| Donald F. Powell | $325 |
| Dan G. McKinney | $325 |
| David G. Moore | $325 |
| David T. Bristow | $275 |
| Terry D. Bridges | $295 |
| Thomas L. Miller | $275 |
| Steven G. Lee | $275 |
| Michael G. Kerbs | $275 |
| James J. Manning, Jr. | $275 |
| Daniel E. Katz | $225 |

                          Associate Attorneys
                          $150 to $325

                          Law Clerks
                          $125

                          Paralegals
                          $60 to $135

- 10 -

1  to 11 U.S.C. § 330 or 331."[19]

2  B.    R&H's Compensation - Calculating the Lodestar & Upward or Downward

3        Departures from the Lodestar Amount

4        Section 330(a)(1) authorizes the court to award to an attorney employed under §

5  327(a) "reasonable compensation for actual, necessary services" rendered by the

6  attorney and "reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A)

7  &(B). This authority includes the discretion, upon motion or sua sponte, to "award

8  compensation that is less than the amount" requested. Id. § 330(a)(2) (emphasis

9  added); see Law Offices of David A. Boone v. Derham-Burk (In re Eliapo), 468 F.3d

10  592, 597 (9th Cir. 2006). Section 330(a)(3) directs the court to assess "the nature, the

11  extent, and the value" of the legal services provided when determining the amount of

12  reasonable compensation to award, taking into consideration "all relevant factors,"

13  including:

14          (A)    the time spent on such services;

15          (B)    the rates charged for such services;

16          (C)    whether the services were necessary to the administration of, or beneficial
                   at the time at which the service was rendered toward the completion of, a
17                 case under this title;

18          (D)    whether the services were performed within a reasonable amount of time
                   commensurate with the complexity, importance, and nature of the
19                 problem, issue, or task addressed; and

20          (E)    whether the compensation is reasonable based on the customary
                   compensation charged by comparably skilled practitioners in cases other
21                 than cases under [title 11].

22  11 U.S.C. § 330(a)(3).

23        In the Ninth Circuit, the primary method used to determine a reasonable fee in

24  bankruptcy cases is to calculate the lodestar. Eliapo, 468 F.3d at 598; Yermakov v.

25  _____

26  [19] Order Authorizing Employment of Reid & Hellyer, A Professional Corporation as Counsel for Chapter 7
    Trustee Retroactive to March 24, 2005, p.1, l.28 to p.2, l.1.
27

1  Fitzsimmons (In re Yermakov), 718 F.2d 1465, 1471 (9th Cir. 1983).[20] A court

2  computes the lodestar by multiplying the number of hours reasonably expended by a

3  reasonable hourly rate. Yermakov, 718 F.2d at 1471; see Hensley v. Eckerhart, 461

4  U.S. 424, 433 (1983) (reasoning that the lodestar "calculation provides an objective

5  basis on which to make an initial estimate of the value of a lawyer's services").

6      Section 330(a)(4)(A) prohibits the bankruptcy court from allowing compensation

7  for unnecessary duplication of services, and services that were not either reasonably

8  likely to benefit the debtor's estate nor necessary to its proper administration. 11 U.S.C.

9  § 330(a)(4)(A). Likewise, hours not reasonably expended because they are "excessive,

10 redundant, or otherwise unnecessary" must be excluded from the lodestar amount.

11 Hensley, 461 U.S. at 434.

12     Once the lodestar is established, there is a strong presumption that the lodestar

13 figure represents a reasonable fee which should be adjusted only in "rare [or]

14 exceptional" cases. Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 478

15 U.S. 546, 565 (1986) ("Delaware Valley I"); Blum v. Stenson, 465 U.S. 886, 897 (1984);

16 Cunningham v. County of L.A., 879 F.2d 481, 488 (9th Cir. 1988), cert. denied, 493 U.S.

17 1035 (1990). The Supreme Court explained the basis for this presumption in Delaware

18

19 _____

20 [20]   The lodestar approach, however, is not the exclusive method for calculating fees. Eliapo, 468 F.3d at
598 (stating that "the lodestar method is not mandatory"); Unsecured Creditors' Comm. v. Puget Sound
Plywood, 924 F.2d 955, 960 (9th Cir. 1991) (explaining that where fee applications are inadequate, courts

21 should not be forced to wade through them to calculate the lodestar); Lobel & Opera v. U.S. Trustee (In re
Auto Parts Club, Inc.), 211 B.R 29, 36 (9th Cir. BAP 1997) (stating that the lodestar approach may be

22 abandoned when the court cannot reasonably quantify to numerical precision the amount of the fee
award). In Puget Sound Plywood, the attorney for the creditors' committee sought compensation for
objecting to attorneys fees claimed by a secured creditor. 924 F.2d at 956-57. After finding the time spent

23 by counsel was excessive in view of the ultimate benefit to the estate, the bankruptcy court rejected the
lodestar approach and based an award of fees on one-third of the amount by which the creditors'

24 attorneys fees were reduced. Id. at 960-61. The Ninth Circuit affirmed both the bankruptcy court's
rejection of the lodestar approach and its alternative approach of using a percentage of the benefit to the

25 estate, noting the applicant's failure to scale his fee to the reasonably expected recovery. Id. at 960; see
Digest & Peck v. Kitchen Factors, Inc. (In re Kitchen Factors, Inc.), 143 B.R. 560, 562 (9th Cir. BAP 1992)

26 (holding that it is appropriate to abandon the lodestar method where the detail of time spent is grossly
disproportionate to the amounts at stake).

27

Valley I:

> [W]hen an attorney first accepts a case and agrees to represent the client, he obligates himself to perform to the best of his ability and to produce the best possible results commensurate with his skill and his client's interests. Calculating the fee award in a manner that accounts for these factors, either in determining the reasonable number of hours expended on the litigation or in setting the reasonable hourly rate, thus adequately compensates the attorney, and leaves very little room for enhancing the award based on his post-engagement performance. In short, the lodestar figure includes most, if not all, of the relevant factors constituting a "reasonable" attorney's fee, and it is unnecessary to enhance the fee for superior performance in order to serve the statutory purpose of enabling plaintiffs to secure legal assistance.

Delaware Valley I, 478 U.S. at 565-66. However, a court is permitted to adjust the lodestar up or down using a "multiplier" based on the criteria listed in § 330 and its consideration of the Kerr[21] factors not subsumed within the initial calculation of the lodestar. See, e.g., Blum, 465 U.S. at 898-901 (reversing an upward multiplier based on factors subsumed in the lodestar determination); Dang v. Cross, 422 F.3d 800, 812 (9th Cir. 2005) (observing that a court, in its discretion, may "adjust the lodestar amount after considering other factors that bear on the reasonableness of the fee"); Cunningham, 879 F.2d at 487 (stating that "Kerr factors that are not subsumed may support adjustments in rare cases"); Cortes v. Metro. Life Ins. Co., 380 F.Supp.2d 1125, 1128 (C.D. Cal. 2005) (noting that the lodestar may be adjusted upward or downward using a multiplier based on the Kerr factors).

The following factors are subsumed within the lodestar and generally cannot serve as an independent basis for an upward adjustment: "[(1)] the novelty [and]

---

[21] The original twelve Kerr factors were:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

Kerr v. Screen Extras Guild, Inc., 526 F.2d 67, 70 (9th Cir. 1975), cert. denied, 425 U.S. 951 (1976).

complexity of the issues, [(2)] the special skill and experience of counsel, [(3)] the quality of representation, and [(4)] the results obtained." Delaware Valley I, 478 U.S. at 565 (internal quotations omitted) (quoting Blum, 465 U.S. at 898-900); Cunningham, 879 F.2d at 487-89; Burgess v. Klenske (In re Manoa Fin. Co.), 853 F.2d 687, 691 (9th Cir. 1988). In making any adjustment, the court must take care not to double count a Kerr factor already considered in calculating the lodestar. Delaware Valley I, 478 U.S. at 566 (opining that a modification of the lodestar should not be predicated upon "the overall quality of performance" due to the "danger of 'double counting'"); Transamerica Natural Gas Corp. v. Zapata P'ship, Ltd. (Matter of Fender), 12 F.3d 480, 488 (5th Cir. 1994) (reversing an upward adjustment due to the double counting of four factors already built into the lodestar calculation); Cunningham, 879 F.2d at 489 (holding that "double counting is impermissible" in ordinary cases).

Upward adjustment of the lodestar amount is permissible, provided there is both "'specific evidence' on the record and detailed findings" that one or more factors are not fully reflected in the lodestar. Delaware Valley I, 478 U.S. at 565 (quoting Blum, 465 U.S. at 898-901); Cunningham, 879 F.2d at 487; Manoa Fin. Co., 853 F.2d at 691. While the standards for upward adjustments of the lodestar, or "fee enhancements," apply to bankruptcy cases, the Ninth Circuit has warned that these general principles "may require some accommodation to the peculiarities of bankruptcy matters, particularly where enhancements relate to the risk of nonpayment." Manoa Fin. Co., 853 F.2d at 691; see Meronk v. Arter & Hadden, LLP (In re Meronk), 249 B.R. 208, 213 (9th Cir. BAP 2000) (stating that "[t]he Manoa Finance test retains vitality despite the 1994 revision of § 330(a) imposing a five-factor test for fees"), aff'd, 24 Fed. Appx. 737 (9th Cir. 2001); see also Matter of UNR Indus., Inc., 986 F.2d 207, 210 (7th Cir. 1993) (adopting the Ninth Circuit's reasoning in Manoa Finance and emphasizing the importance of providing "compensation in bankruptcy equivalent to that outside it");

1  Novelly v. Palans (In re Apex Oil Co.), 960 F.2d 728, 732 (8th Cir. 1992) (finding that

2  "the lodestar approach, including the possibility of adjustments in rare and exceptional

3  circumstances, is an appropriate method to use in calculating reasonable compensation

4  under § 330"); Grant v. George Schumann Tire & Battery Co., 908 F.2d 874, 878 (11th

5  Cir. 1990) (divining a congressional intent that "there should be no distinction between

6  fees set in bankruptcy cases and those set in non-bankruptcy cases").

7      1. Quality of Representation

8      Quality of representation is normally considered at the lodestar stage in

9  determining a reasonable hourly rate. Van Gerwen v. Guar. Mut. Life Co., 214 F.3d

10  1041, 1046 (9th Cir. 2000). By factoring quality of representation into the multiplier, a

11  court runs the risk of double counting. Delaware Valley I, 478 U.S. at 566; Van Gerwen,

12  214 F.3d at 1046. However, quality of representation may be relied upon to adjust the

13  lodestar up or down provided there is "specific evidence that the attorney's performance

14  is exceptional or abysmal." Van Gerwen, 214 F.3d at 1046 (quoting Cunningham, 879

15  F.2d at 487).

16      2. Risk of Non-Payment

17      Risk of non-payment, although subsumed within the initial calculation of the

18  lodestar,[22] is a factor that may be given weight in awarding a fee enhancement.

19  Delaware Valley II, 483 U.S. at 731. Before an adjustment for risk assumption is

20

---

21  [22] In Pennsylvania v. Del. Valley Citizens' Council for Clean Air, 483 U.S. 711 (1987) ("Delaware Valley
22  II"), the Supreme Court held that the enhancement of a reasonable lodestar fee solely for assuming a risk
   of loss is impermissible under the usual fee shifting statutes, stating:

23      [W]hen an attorney ultimately prevails in such a lawsuit, this success will be primarily attributable
        to his legal skills and experience, and to the hours of hard work he devoted to the case. These
24      factors, however, are considered by the court in determining the reasonable number of hours
        expended and the reasonable hourly rate for the lodestar, and any further increase in this sum
25      based on the risk of not prevailing would result not in a "reasonable" attorneys's fee, but in a
        windfall for an attorney who prevailed in a difficult case.
26

27  Id. at 726-27.

- 15 -

1   appropriate, there must be evidence upon which the court can base a finding that

2   "without risk enhancement plaintiff would have faced substantial difficulties in finding

3   counsel in the local or other relevant market," and further, that the enhancement sought

4   reflects "the difference in market treatment of contingent fee cases <u>as a class</u>, rather

5   than . . . the 'riskiness' of any particular case." <u>Id.</u> (emphasis in original); <u>see</u> <u>Hasbrouk</u>

6   <u>v. Texaco, Inc.</u>, 879 F.2d 632, 636 (9th Cir. 1989); <u>Fadhl v. City and County of S.F.</u>, 859

7   F.2d 649, 650 (9th Cir. 1988).  Absent "the most exacting justification," however, an

8   upward adjustment for risk of non-payment should be "limited to one-third of the

9   lodestar."  <u>Delaware Valley II</u>, 483 U.S. at 730; <u>In re D.W.G.K. Restaurants</u>, 106 B.R.

10  194, 197 (Bankr. S.D. Cal. 1989).  <u>But see</u> <u>In re Farah</u>, 141 B.R. 920, 928-29 (Bankr.

11  W.D. Tex. 1992) (concluding that "the 30% cap suggested in <u>Delaware II</u> is not a cap

12  applicable to enhancement awards in bankruptcy cases, because the rationale that

13  supports the cap has no application to bankruptcy").

14          3.  <u>Results Achieved</u>

15          By the same token, the results achieved may, under appropriate circumstances,

16  serve as the basis for a fee enhancement, such as when a skilled lawyer obtains an

17  exceptional result efficiently, quickly and effectively.  <u>In re Gencor Indus., Inc.</u>, 286 B.R.

18  170, 178 (Bankr. M.D. Fla. 2002); <u>see</u> <u>Farah</u>, 141 B.R. at 925 (opining that "[t]he 'results

19  obtained' factor is one of the more significant factors in determining whether the

20  circumstances of a case are so 'exceptional and rare' as to warrant a fee

21  enhancement").  "'Exceptional results are results that are out of the ordinary, unusual or

22  rare.'"  <u>Grant</u>, 908 F.2d at 880 (quoting <u>Norman</u>, 836 F.2d at 1302).  But even an

23  exceptional result falls short of meriting an enhancement to the lodestar absent specific

24  evidence establishing that "the quality of service rendered was superior to that one

25  reasonably should expect in light of the hourly rates charged."  <u>Blum</u>, 465 U.S. at 899;

26  <u>see, e.g.</u>, <u>Apex Oil Co.</u>, 960 F.2d at 732 (concluding that the applicant must establish

27

- 16 -

1   that "the quality of service rendered and the results obtained were superior to what one

2   reasonably should expect in light of the hourly rates charged and the number of hours

3   expended"); Norman, 836 F.2d at 1302 (holding that there must be "specific evidence in

4   the record to show that the quality of representation was superior to that which one

5   would reasonably expect in light of the rates claimed"); First Nat'l Bank of Chi. v. Comm.

6   of Creditors Holding Unsecured Claims (In re Powerine Oil Co.), 71 B.R. 767, 773 (9th

7   Cir. BAP 1986) (stating that the applicant must not only offer "specific evidence as to

8   what made the results it obtained so outstanding or exceptional," but the court must also

9   find that "the lodestar amount is not fully compensatory"). The "rare and exceptional"

10  threshold is met if the results obtained "exceed the reasonable expectations of the

11  parties under the Bankruptcy Code." Farah, 141 B.R. at 925.

12          In the Ninth Circuit, an attorney seeking an enhancement based on results

13  achieved has the burden of establishing with "specific evidence [that (1)] the results

14  obtained were not reflected in either [the attorney's] standard hourly rate or the number

15  of hours allowed [and (2)] that the bonus is necessary to make the award

16  commensurate with compensation for comparable non-bankruptcy services." Manoa

17  Fin. Co., 853 F.2d at 692; see Cedric Dev. Co. v. Warnicke (In re Cedric Dev. Co.), 219

18  F.3d 1115, 1117 (9th Cir. 2000) (holding that a bankruptcy court did not abuse its

19  discretion in finding that a $10,000 enhancement was necessary to provide reasonable

20  compensation because the firm's hourly rate "did not take into account the results

21  obtained and/or the risk of nonpayment") (quotations omitted); Meronk, 249 B.R. at 214

22  (stating that the existence of a surplus estate does not, in itself, entitled trustee's

23  counsel to a bonus).

24  C.      R&H's Fee Enhancement

25          In this case, R&H's performance was exceptional. After the case was reopened,

26  R&H pursued Buckridge and Norris relentlessly to locate and seize the Inheritance.

27

- 17 -

1    Through dogged determination, R&H overcame the concerted efforts of Buckridge and

2    Norris to transfer and conceal the Inheritance and ultimately recovered $300,000 for the

3    estate – an amount sufficient to pay 100% of all claims and administrative expenses in

4    the case.  R&H converted this "no-asset" case into a surplus estate, and did so at its

5    own expense.  R&H bore the risk of non-payment entirely because there were no estate

6    funds to finance its efforts.[23]  R&H also secured revocation of the discharge granted to

7    Buckridge on October 19, 2004.  Not only were the results outstanding, but R&H's level

8    of representation in achieving these results was extraordinary and superior in quality to

9    that which would be reasonably expected in light of the hourly rates charged.

10        Nor is the lodestar fully compensatory in this case because the rates claimed by

11    R&H are below the prevailing market rates for comparably skilled attorneys in the

12    Central District of California.[24]  Three attorneys from R&H rendered the legal services

13    for which compensation is sought in this case:  Mr. Schnitzer, Ms. Warriner and Ms.

14    Lee, whose hourly rates are $395, $350 and $175, respectively.  Mr. Schnitzer, who

---

15  [23] While R&H bore the risk of nonpayment in accepting employment as Whitmore's counsel to recover the
16  Inheritance, the court gives little weight to this factor in deciding whether an upward adjustment to the
    lodestar is merited in this case.  There is insufficient evidence that Whitmore faced substantial difficulty in
17  locating an attorney to pursue recovery of the Inheritance prior to employing R&H.  Nor is there sufficient
    evidence to support a finding that the enhancement sought reflects "the difference in market treatment of
18  contingent fee cases as a class, rather than . . . the 'riskiness' of any particular case."  Delaware II, 483
    U.S. at 731 (emphasis in original).  Without such a showing, the court must conclude that the lodestar
19  amount adequately compensates R&H for the risk of nonpayment.

20  [24] In reviewing the reasonableness of an attorney's rate, the court is guided by the "prevailing market rates
    in the relevant community."  Blum, 465 U.S. at 895 & n.11; Hensley, 461 U.S. at 433; Guam Soc'y of
21  Obstetricians & Gynecologists v. Ada, 100 F.3d 691, 696 (9th Cir. 1996).  Once the number of hours is
    set, the second prong of the lodestar analysis requires the court to "determine a reasonable hourly rate
22  considering the experience, skill, and reputation of the attorney requesting fees."  Chalmers v. City of L.A.,
    796 F.2d 1205, 1210 (9th Cir. 1986), amended 808 F.2d 1373 (9th Cir. 1987).  This determination "is not
23  made by reference to rates actually charged the prevailing party."  Id.  Rather, the court must look to the
    prevailing market rate in the community for similar services of lawyers of reasonably "comparable skill,
24  experience, and reputation."  Id. at 1210-11; see Schwartz v. Sec'y of Health & Human Servs., 73 F.3d
    895, 908 (9th Cir. 1995).  In bankruptcy cases, the hourly rate must compare favorably to the rate that
25  would be charged by "comparably skilled" attorneys for similar services rendered in a non-bankruptcy
    context.  11 U.S.C. § 330(a)(3)(F); see Cedric Dev. Co., 219 F.3d at 1117 (upholding a bankruptcy court's
26  fee enhancement where the rates actually charged "were bargain rates"); Yermakov, 718 F.2d at 1471
    (stating that "the hourly rate must be based on the rate that would be charged for comparable services in a
27  non-bankruptcy case").

1   performed a substantial portion of the work, was admitted to the practice of law in

2   Virginia in 1966 and California in 1971.  He has practiced primarily in the area of

3   bankruptcy law since 1979.  Ms. Warriner was admitted to practice in California in 1977.

4   Both have extensive experience in bankruptcy matters, and are highly respected

5   bankruptcy attorneys in the Central District of California.  R&H submitted evidence

6   concerning the billing rates of comparably skilled bankruptcy lawyers at three other law

7   firms in the Central District of California:  Robinson, Diamont & Wolkowitz; Danning, Gill

8   Diamond & Kollitz, LLP, and Levene, Neale, Bender, Rankin & Brill, LLP.[25]  The

9   evidence supports a finding that the prevailing market rates in the Central District of

10  California for similar services of lawyers of reasonably comparable skill, experience, and

11  reputation would be upwards of $550, $525 and $300 per hour, respectively.

12      Given the quality of representation at below market rates and the results

13  achieved, an upward adjustment of the lodestar is necessary to make the award

14  commensurate with compensation for comparable non-bankruptcy services.  Multipliers

15  of between 1.5 and 2.57 have been approved by courts in similar cases.  See, e.g., In re

16  Miniscribe Corp., 309 F.3d 1234, 1245 (10th Cir. 2002) (affirming a 2.57 lodestar

17  multiplier adopted by the district court based on results achieved); Farah, 141 B.R. at

18  924-25 (finding that a 2.0 lodestar multiplier was necessary to recognize "the

19  _____

20  [25] R&H bore the burden of establishing that "its standard hourly rates were unreasonably low and that
    comparable nonbankruptcy services would have yielded a higher fee." Meronk, 249 B.R. at 213.  Indeed,
21  the burden is always on the applicant to submit evidence supporting the hours worked and the rates
    claimed. Blum, 465 U.S. at 895 n.11 (stating that the applicant bears the burden of producing satisfactory
22  evidence "that the requested rates are in line with those prevailing in the community for similar services by
    lawyers of reasonably comparable skill, experience and reputation"); Jordan v. Multnomah County, 815
23  F.2d 1258, 1263 (9th Cir. 1987) (citing Blum, 465 U.S. at 895 n.11); Norman, 836 F.2d at 1299 (stating
    that "[t]he applicant bears the burden of producing satisfactory evidence that the requested rate is in line
24  with prevailing market rates").  The relevant legal community is the "forum district." Mendenhall v. Nat'l
    Transp. Safety Bd., 213 F.3d 464, 471 n.5 (9th Cir. 2000); Barjon v. Dalton, 132 F.3d 496, 500 (9th Cir.
25  1997); Gates v. Deukmejian, 987 F.2d 1392, 1405 (9th Cir. 1992).  Declarations by the applicant and other
    attorneys regarding the prevailing market rates in the Central District of California are sufficient to
26  establish the appropriate rate in this district for lodestar purposes. See Mendenhall, 976 F.2d at 471 n.5;
    United Steelworkers of Am. v. Phelps Dodge Corp., 896 F.2d 403, 407 (9th Cir. 1990); Cortes, 380
    F.Supp.2d at 1129.

27

1   extraordinary contribution of counsel to the success of [the] case, while remaining

2   faithful to the public's interest in discouraging professionals from succumbing to

3   excessive greed); In re Elmendorf Bd. Corp., 57 B.R. 580, 587 (Bankr. D.N.H. 1986)

4   (adopting a 1.5 multiplier to upwardly adjust fees of creditors' committee counsel and a

5   1.75 multiplier to enhance fees of chapter 11 trustee's counsel for "'exceptional' results

6   obtained and the 'risk of nonpayment' contingency"). Therefore, the court finds that

7   R&H extraordinary contribution to the success of this case merits a fee enhancement of

8   1.75 times lodestar.

9                                    III. CONCLUSION

10          Based on the foregoing, the court approves an allowance of $69,599.38 in

11  attorney's fees,[26] plus reimbursement of $3,421 in expenses, to R&H as final

12  compensation for actual, necessary services rendered in the administration of this

13  estate, finding that such compensation meets the requirements of § 330(a) and is

14  reasonable.

15          Whitmore and R&H shall submit a separate order allowing final compensation in

16  this case consistent with this opinion.

17  Dated: March 9, 2007

                                              _____
18                                            PETER H. CARROLL
                                              United States Bankruptcy Judge
19

20

21

22

-----

23  [26] R&H's final fee award includes the sum of $5,016.50 in fees, representing 12.7 hours of legal services

24  at $395 per hour, rendered between January 23, 2007 and February 15, 2007, defending Buckridge's
    objections to its final application for compensation in this case. No party in interest, including the UST,

25  has objected to R&H's request to be compensated for the time and expense incurred litigating Buckridge's
    objections to its final fee application. The court finds that the services for which such compensation is

26  sought satisfy the requirements of § 330(a)(4)(A), and the time and expenses incurred were necessary
    within the meaning of § 330(a)(1). See Smith v. Edwards & Hale, Ltd. (In re Smith), 317 F.3d 918, 928

27  (9th Cir. 2002).

**NOTE TO USERS OF THIS FORM:**
*Physically attach this form as the last page of the proposed Order or Judgment.*
*Do **not** file this form as a separate document.*

| | |
|---|---|
| In re CHARLES RUSSELL BUCKRIDGE, JR.<br><br>Debtor. | CHAPTER 7<br><br>CASE NUMBER RS 04-17991 PC |

## NOTICE OF ENTRY OF JUDGMENT OR ORDER
## AND CERTIFICATE OF MAILING

TO ALL PARTIES IN INTEREST ON THE ATTACHED SERVICE LIST:

1.    You are hereby notified, pursuant to Local Bankruptcy Rule 9021-1(a)(1)(E), that a judgment or order entitled
      *(specify)*: MEMORANDUM DECISION   MAR 1 2 2007

      was entered on *(specify date)*:

2.    I hereby certify that I mailed a copy of this notice and a true copy of the order or judgment to the persons and
      entities on the attached service list on *(specify date)*:
      MAR 1 2 2007

Dated:            MAR 1 2 2007                     **JON D. CERETTO**
                                                   **Clerk of the Bankruptcy Court**

                                                   By: _____
                                                            *Deputy Clerk*

Service List

Charles Russell Buckridge, Jr.
34991 Hollyoak Way
Yucaipa, CA 92399

Gary Swanson, Esq.
155 W. Hospitality Ln., Ste. 205
San Bernardino, CA 92408

Robert Whitmore
Chapter 7 Trustee
3600 Lime Street, Suite 611
Riverside, CA 92501

United States Trustee
3685 Main Street, Suite 300
Riverside, CA 92501

Mark C. Schnitzer, Esq.
Reid & Hellyer, APC
P.O. Box 1300
Riverside, CA 92502